# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| JOANN SOMMERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 6:13-cv-03472-NKL |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | |

## ORDER

Joann Sommers appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits under 42 U.S.C. §§ 401-434. The Commissioner's decision is affirmed.

**I.     Background**

Sommers was born in 1958 and is a high school graduate. She worked for the U.S. Postal Service for about 25 years. In 1995, while she was working for the Postal Service, a former postal employee robbed a branch of Sommers' post office and murdered four people, including two of Sommers' coworkers. Sommers was not present but suffered post-traumatic stress disorder after the event. Sommers testified that she took a disability retirement from the Postal Service in August 2008, because she was physically unable to perform the job duties, including lifting the bags and trays of mail, and being unable to stand or sit for any length of time, and because she was having nightmares and could not sleep. She said the Postal Service was "not willing to give [her] light duty any more." Tr. 37. She has not worked since then.

Sommers claims disability due to fibromyalgia, depression, rheumatoid arthritis, post-traumatic stress disorder, anxiety, emphysema, asthma, and carpal tunnel syndrome for the

period July 1, 2010[1] through December 31, 2011. The ALJ concluded that during the relevant time frame, Sommers had severe impairments of fibromyalgia syndrome, depression, anxiety disorder, pain disorder, history of polysubstance abuse, right shoulder bursitis, left knee degenerative joint disease, degenerative disc disease, and obesity. Tr. 14.

Sommers' primary care physician, Dr. Estrellita Villazor, saw Sommers from February 2003 to August 2007. Dr. Villazor diagnosed Sommers with anxiety and depression in 2003 and 2004, and in 2004 prescribed Zoloft. In 2003, the doctor limited Sommers to no lifting over ten pounds. In 2004, an MRI of Sommers' right shoulder showed bursitis and torn cartilage. In 2007, the doctor noted Sommers had "rheumatoid" issues. Tr. 373. Studies of Sommers' spine, knees, hands and ankles by x-ray and MRI showed mild or negative findings, and there was no history of injury. In December 2007, Dr. Villazor filled out a form Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities (the MSSP). Dr. Villazor opined that Sommers was limited to lifting and carrying no more than two to three pounds, one hour of standing and walking, and four hours of sitting per day. The doctor also indicated that Sommers was limited to occasional bending, kneeling, stooping, crouching, balancing, and climbing, and that reaching, handling, and fingering were limited, but did not specify to what extent. The doctor indicated that the restrictions producing the restrictions were "low back pain; shoulder and wrist pain; [and] severe depression." Tr. 446-447.

In 2013, Sommers began receiving treatment at the Jordan Valley Community Health Center. Her doctor noted difficulty with attention and concentration, as well as anhedonia, anxiety and feelings of hopelessness. She was diagnosed with depression, PTSD, and myalgia and myositis, and prescribed Zoloft.

---

[1] Sommers initially claimed disability for the period beginning August 1, 2008 but amended the alleged onset date to July 1, 2010 at the hearing of her claim.

Sommers has been evaluated by several consultative examiners. In March 2010, she was evaluated for psychological functioning by Samuel Hester, Ph. D. He noted she had had no therapy or treatment since 2009. She had some tearfulness and depressed and anxious mood, secondary to the death of her spouse, and was alert and oriented to all spheres. Dr. Hester concluded she was capable of adequate activities of daily living and could communicate adequately, maintain concentration, persistence and pace, but would have difficulty with tasks involving a lot of walking. She was diagnosed with depression, PTSD, pain disorder with physical and psychological factors and amphetamine dependence in full-sustained remission. Dr. Hester assigned a GAF score of 45-50, suggesting serious symptoms, but the ALJ concluded the GAF estimate was internally inconsistent with the overall conclusions of the evaluation, and Dr. Hester's findings suggested moderate rather than marked limitations. Accordingly, the ALJ gave the GAF estimate limited weight.

In April 2010, Sommers was seen by consulting examiner Michael Spataro, M.D., who noted low back pain and depression with fibromyalgia and arthritis. She had full range of motion in all extremities, and could walk short distances without the cane or braces she had been using, which Dr. Spataro noted were not medically necessary. Dr. Spartaro, who opined that Sommers was capable of sitting, standing and walking for a full workday, could lift and carry without significant limitations and was able to respond to questions, carry on a conversation and could remember and carry out instructions. The ALJ found Dr. Spataro's opinion consistent with the medical evidence of record and gave it significant weight.

In June 2011, Sommers was evaluated for physical and psychological functioning by consultative examiner Mark Johnston, M.D. The doctor noted that Sommers had a 20-year history of Lyme Disease, fibromyalgia and rheumatoid arthritis. He noted a history of bilateral

carpal tunnel repairs. Sommers claimed daily discomfort and pain in multiple joints including the low back, ankles knees, elbows and hands. The doctor found Sommers' gait normal and that she did not need the cane she carried. He found most of the physical examination normal, though Sommers could not heel or toe walk. There were nine of 18 tender points of fibromyalgia, and Sommers had no muscle atrophy anywhere. Her handgrip strength was 5/5 and straight leg raising was negative on both sides. Dr. Johnston considered her progress to be fair. He noted moderate restrictions on reaching, pushing and pulling with the right upper extremity as a result of shoulder pain, and that the Sommers could not reach overhead at all with the right arm. Dr. Johnston also concluded that she should also avoid pulmonary irritants, secondary to allegations of asthma and emphysema. The ALJ gave Dr. Johnston's opinion some weight.

In July 2011, Solmmers was evaluated for psychological functioning by consultative examiner Leslie Halprin, Ph. D. Dr. Halprin noted the presence of mood depression as a result of pain issues, with some crying spells and suicidal thoughts with neither intent nor plan. Sommers had no thought disorders, had intact insight and judgment, a dysthymic mood, and no significant interference with daily function. She was diagnosed with adjustment disorder; depressed mood, which was moderate and chronic; and substance dependence in full-sustained remission. The doctor provided no GAF assessment, and determined that there were no significant deficits of function based on psychological impairments. Dr. Halprin found Sommers was able to follow simple tasks and some complex tasks, maintain attention and concentration, maintain a schedule, relate adequately with others, and deal with her stressors. The ALJ found Dr. Halprin's conclusions to be supported by Dr. Helprin's report and consistent with the other evidence of record, and that they warranted some deference.

Sommers was evaluated for psychological functioning in August 2011, in a psychiatric

review technique form (PRT) statement by L. Hoffman, Ph. D. The doctor found non-severe or mild limitations, which the ALJ gave little weight, in view of Sommers' testimony and the opinions of the consultative examiners who actually saw and evaluated Sommers. The ALJ rejected the April 2012 opinion of Heather Mesker, a DDS counselor who determined none of Sommers' psychological or physical limitations was disabling, because Mesker is a lay decision-maker.

At the July 2103 hearing, Sommers testified that she has anxiety attacks and depression, which cause her not to sleep or socialize. She testified that she "can't comprehend anything, [or] think straight." Tr. 39. She tries to accomplish one thing around the house each day, such as laundry or vacuuming. She tries to cook, but cannot lift heavy pots. She may go out once a month with her boyfriend, to eat or to see a free movie in the park, but does not stay out long because she needs to sit and rest. Her boyfriend goes grocery shopping with her and lifts bags out of the cart. She began receiving treatment at the Jordan Valley health center in 2013, and takes Zoloft, Gabapentin, and Tizandine. She testified that a noticeable side effect of the medications is that she "gets very tired…within the hour after taking them" and she "[has] to lay down" for "[a]bout two hours." Tr. 42. The last time she saw a mental health professional was around 2007, before she left the Postal Service. She testified that she has pain all the time, and cannot walk more than one block, stand more than 15 or 20 minutes, sit more than 30 minutes, raise her arms above shoulder height, or lift anything heavier than a gallon of milk. She coupons and uses the computer for about two hours every day to keep up with family. She rode the bus for 30 hours to come to attend the hearing.

With respect to residual functional capacity, the ALJ concluded Sommers could perform light work as defined in 20 CFR 404.1567(b) except that she could only sit for six of eight hours

5

per day, 2 hours at a time, and stand and walk for six of eight hours per day, 2 hours at a time; could lift 20 pounds occasionally and ten pounds frequently; could not climb ladders, ropes or scaffolds; could occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl; and had to avoid concentrated exposure to extremes of temperature, vibrations or pulmonary irritants. The ALJ further concluded Sommers could not be placed in high stress work, such as work requiring fast paced activity, or strict and explicit quotas, deadlines or schedules, or frequent or unusual changes in work setting; that she was unable to sustain a high level of concentration, such as sustained attention to detail, but could sustain a simple routine, or simple repetitive tasks; and that she should not have to work with close personal interactions with co-workers or supervisors, no required public contact and no work above shoulder level.

The Vocational Expert opined that although Sommers could not perform her prior work, she could perform light, unskilled jobs such as bench assembler, bakery line worker, and cleaner, jobs existing in significant numbers in the national economy.

## II.     Discussion

Sommers argues that the decision must be reversed because the ALJ mistakenly identified Dr. Spataro as a treating physician; the ALJ applied the wrong age classification; PTSD was not included as a medically determinable impairment; Sommers' fibromyalgia was analyzed under 1990 rather than 2010 criteria; Dr. Villazor's opinion was given little weight; and the Postal Service considers Sommers disabled. None of the arguments merits reversal.

### A.     Dr. Spataro's opinion

Sommers first argues that the decision must be reversed because the ALJ erroneously believed Dr. Spataro was Sommers' treating physician. Dr. Spataro was actually a consultative examiner who evaluated Sommers once, in April 2010. The error was not prejudicial.

A non-treating medical source opinion cannot be given controlling weight and a non-treating source opinion does not, standing alone, constitute substantial evidence in support of an ALJ's decision. *E.g., Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011. But a non-treating source opinion can be afforded significant, if less than controlling, weight. *E.g., Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010), and *Wiese v. Astrue*, 552 F.3d 728, 732 (8th Cir. 2009). When the non-treating source opinion is supported by the record, it can even be given more weight than the opinion of a treating source. *Id.*

Further, an error that results in no prejudice does not merit reversal. *See, e.g., Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (deficiency that had no bearing on outcome did not require reversal); *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004) ("We will not set aside an administrative finding based on an 'arguable deficiency in opinion-writing technique' when it is unlikely it affected the outcome.").

Here, although the ALJ referred to Dr. Spataro as a treating physician, the ALJ did not give his opinion the controlling weight reserved for the opinions of treating physicians. The ALJ gave it "significant" weight and departed from Dr. Spataro's opinion in certain respects. Tr. 18. In formulating his opinion, Dr. Spataro noted Sommers' history of low back pain, depression, fibromyalgia, and arthritis. On physical examination, he found Sommers had full range of motion in all extremities; could walk short distances without the cane and knee brace she was using and which were not medically necessary; had stable station without her cane; could rise from a sitting position without assistance; could bend and squat without difficulty; and could stand on her tiptoes and heels and tandem-walk without problems. Dr. Spataro found that Sommers should be able to sit, walk and stand for a full work day, and could lift and carry objects without limitation, hold a conversation, respond appropriately to questions, and carry out

and remember instructions.

Dr. Spataro's opinion was consistent with the medical evidence of record. For example, studies of Sommers' spine, knees, hands and ankles by x-ray and MRI showed mild or negative findings, and there was no history of injury. Mark Johnston, M.D., performed a physical and psychological consultative examination in June 2011, and like Dr. Spataro had concluded Sommers had normal gait and did not need her cane, and found most of her physical examination normal.

In formulating Sommers' RFC, however, the ALJ departed from Dr. Spataro's opinion in some respects, by including limitations the doctor had not, in view of all of Sommers' symptoms, the objective medical and other evidence, and the opinion evidence of record. Tr. 16. The RFC limited Sommers to six hours of sitting, standing and walking in an eight-hour workday, and lifting and carrying 20 pounds occasionally, and ten pounds frequently; and included other environmental, postural, and mental limitations.

Whether the ALJ mistakenly believed Dr. Spataro was Sommers' treating physician or simply made a typographical error, Sommers does not demonstrate how the error prejudiced her. The ALJ did not afford the opinion controlling weight, the opinion was consistent with the medical evidence, and the ALJ even departed from the opinion in certain respects by imposing limitations the doctor did not suggest. Sommers' first argument therefore fails.

**B.     Sommers' age classification**

Citing Rule 201.06 of the Medical-Vocational Guidelines, Sommers argues that the ALJ's statement that Sommers "was 53 years old, which is defined as a younger individual age 18-49, on the date last insured" erroneously "plac[ed] upon [her] the additional burden to prove that she could do less than sedentary work." Doc. 10, p. 21. Sommers argues that at age 53, she

was in fact a person "closely approaching advanced age," *see* 20 C.F.R. § 404.1563(c) and (d), and that she would "Grid out," or be found disabled, under Rule 201.06 of the Guidelines if she were capable of only sedentary work. Doc. 10, p. 21. The ALJ's error in identifying Sommers' age category does not merit reversal.

It was Sommers' burden, not the Commissioner's, to prove Sommers' RFC. *See Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Sommers' proof demonstrated she was capable of a range of light work during the relevant 18-month time period. Tr. 16. The guidelines direct a finding of "not disabled" for a person who is 53, with a high school education or more, with no transferable skills, who is capable of light work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, Rule 202.14.

The ALJ's description of Sommers as a younger individual, rather than one closely approaching advanced age, caused no prejudice.

### C. PTSD not included as a Medically Determinable Impairment

Sommers argues that the ALJ made a legal error in not acknowledging Sommer's PTSD at Step 2 of the sequential analysis or including it as a medically-determinable impairment, and thereby failed to properly consider the non-exertional restrictions PTSD caused. Doc. 10, pp. 22-23 and Doc. 14, p. 6. Sommers points to no authority requiring reversal on the sole basis that a diagnosis is not explicitly acknowledged or included as medically determinable at Step 2. And as discussed below, she does not demonstrate any prejudice. An error that results in no prejudice does not merit reversal. *Hepp*, 511 F.3d at 806; *Strongson*, 361 F.3d at 1072.

At Step 2, the ALJ determines whether a claimant has a medically determinable impairment that is "severe" or combination of impairments that is "severe." 20 CFR

9

§§ 404.1505 and 404.1520(c). If the ALJ finds a severe impairment or combination of impairments, the analysis proceeds to Step 3.

Here, while the ALJ omitted mention of Sommers' diagnosis of PTSD at Step 2, the ALJ found Sommers had other severe impairments and proceeded to the next steps, where the ALJ did consider Sommers' PTSD. At Step 3, in considering whether Sommers met a medical listing, the ALJ concluded Sommers had moderate difficulties in social functioning, noting that she "has some anxiety and post-traumatic stress disorder (PTSD), which would account for some problems of interactions with others," but that she was able to get out and socialize as needed. Tr. 15.

At Step 4, in assessing RFC, the ALJ noted that Sommers was diagnosed with PTSD by Jordan Community Health Center providers, and a consultative examiner, Dr. Hester. On the other hand, Dr. Halpirn diagnosed adjustment disorder with depressed mood, and substance dependence in remission, but not PTSD. The ALJ noted there was no significant psychiatric treatment history and Sommers testified she had not seen a mental health counselor since about 2007. The ALJ concluded that Sommers' dysthymic mood was sufficient to cause moderate limitations in concentration, persistence and pace, and her isolative behaviors moderately restrict social functioning, but with the accommodations in the established RFC, they were not disabling.

Sommers adds that her PTSD causes her to need to sleep for two to three hours in the afternoons, pointing to symptoms of PTSD listed in the Diagnostic and Statistical Manual of Mental Disorders, and argues that her PTSD therefore prevents her from working. Doc. 10, p. 22. Sommers' argument is not supported by medical evidence in the record. Moreover, her testimony at the hearing attributed her sleeping to the medications she was prescribed in 2013,

after the alleged period of disability.

Sommers demonstrates no reversible error with respect to the omission of mention of PTSD at Step 2.

### D. Evaluation of fibromyalgia

Sommers argues that the ALJ failed to properly evaluate her fibromyalgia under SSR 12-2p. More specifically, Sommers argues that the ALJ "committed legal error in failing to apply SSR 12-2p Fibromyalgia's 2010 [American College of Rheumatology] diagnostic criteria to the facts of [her] claim, which would have confirmed the [fibromyalgia] diagnosis and its impact." Doc. 10, pp. 18, 23. Sommers further states that the ALJ "ignores the required analysis under the 2010 ACR second prong of somatic symptoms that substitute for the required 11 pressure points in the 199[0] American College of Rheumatology (ACR) criteria." *Id.* at 25. The ALJ expressly considered Sommers' fibromyalgia complaints in evaluating her claim and there is substantial evidence to support the ALJ's conclusion.

Social Security Ruling 12-2P is a 2012 ruling by the Commissioner providing clarification on the evaluation of fibromyalgia for disability determinations. *See* 2012 WL 3104869. Although not binding law, the ruling provides guidance to an ALJ considering whether a claimant's symptoms constitute a medically determinable impairment. The ruling explicitly provides that either the ACR 1990 criteria or the 2010 ACR criteria may be used to establish a medically determinable impairment of fibromyalgia. 2012 WL 3104869 at *2. Accordingly, in this case, the ALJ could not have erred in selecting one set of criteria over the other.

Further, Sommers does not demonstrate prejudice in the use of one set of criteria over the other. Although the ALJ observed that Dr. Johnston's examination revealed only nine of 18

tender points, rather than the 11 tender points required for a diagnosis of fibromyalgia under the 1990 ACR criteria, the ALJ nevertheless found Sommers' fibromyalgia to be a severe, medically determinable impairment at Step 2 of the sequential evaluation process, and proceeded to consider it in subsequent steps.

In addition, SSR 12-2P identifies several symptoms that are consistent with a fibromyalgia diagnosis, including pain in all quadrants of the body, tiredness and fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety, muscle pain, and muscle weakness. 2012 WL 3104869 at *2-3 and n. 9. In considering the intensity and persistence of a claimant's pain or symptoms, the ALJ may consider the medical records; medications or other treatments the claimant uses; the nature and frequency of the claimant's attempts to obtain medical treatment for symptoms; and the claimant's activities of daily living. *Id.* at *5. Here, the ALJ considered such factors in connection with Sommers' fibromyalgia, expressly noting that Sommers was prescribed medication for control of fibromyalgia pain based on positive testing results. The ALJ also considered Sommers' subjective allegations, including her testimony that she could not raise her arms above the shoulders; that she had pain from fibromyalgia and arthritis pain in the low back, hips, feet, and ankles; that she was unable to work because she was no longer able to sit or stand for long periods of time, could not carry very much weight, had trouble breathing, experienced depression, did not sleep well, could not think straight, and had to take naps during the day to compensate for lost sleep at night. The ALJ simply found her subjective complaints to be only partially credible to the extent that she claimed they prevented her from all work, instead concluding that the record as a whole showed Sommers retained the RFC for a range of light work despite her impairments.

The ALJ's evaluation of Sommers' fibromyalgia and the ALJ's conclusions are based on

substantial evidence on the record as a whole.

   E.   **Dr. Villazor's opinion**

Sommers also claims that the ALJ should have found her disabled based on the opinion of a physician, Dr. Estrellita Villazor, who last treated Sommers in August 2007, three years before the alleged onset date of October 2010. The ALJ gave Dr. Villazor's opinion little weight.

Dr. Villazor filled out an MSSP form in December 2007. The doctor opined that Sommers was limited to lifting and carrying no more than two to three pounds, one hour of standing and walking, and four hours of sitting per day. The doctor also opined that Sommers was limited to occasional bending, kneeling, stooping, crouching, balancing, and climbing, and that reaching, handling, and fingering were limited to an unspecified extent.

Sommers does not explain how the 2007 opinion was relevant to her claim for disability with an alleged July 2010 onset date. The ALJ nevertheless considered it, and discounted it for a number of reasons. An ALJ decides how much weight to afford each medical opinion. *See Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) ("It [is] the ALJ's task to resolve conflicts in the evidence."). A treating physician's opinion "does not automatically control in the face of other credible evidence on the record that detracts from" it, *Brown v. Astrue,* 611 F.3d 941, 951 (8th Cir. 2010), and may be afforded less weight than non-treating physician's opinions when inconsistent with or contrary to other substantial evidence, *Edwards v. Barnhart,* 314 F.3d 964, 967 (8th Cir. 2003). An ALJ may also discount conclusory opinions that lack citation to medical evidence. *Strongson v. Barnhart*, 361 F.3d 1066, 1070-71 (8th Cir. 2004). An ALJ may also give less weight to a treating physician's opinion when based largely on a claimant's subjective complaints rather than objective medical evidence. *Kirby v. Astrue,* 500 F.3d 705, 709 (8th Cir.

2007).

Dr. Villazor's opinion was afforded little weight because it was conclusory, offering no supporting clinical findings, and nothing in the medical evidence of record supported the severe limitations in lifting, sitting, or standing that the doctor identified. Dr. Villazor's opinion also appeared to rely on Sommers' subjective allegations, which the ALJ found unsupported by the record as a whole. Tr. 19.

Finally, the ALJ was not required to defer to Dr. Villazor's conclusion that Sommers was disabled for a month in early 2003. Tr. 19, 377. Dr. Villazor did not provide a medical basis for the conclusion. In any event, whether a person is disabled is a matter reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

The ALJ's decision to give Dr. Villazor's opinion little weight was appropriate and supported by substantial evidence in the record.

**F. The U.S. Postal Service's declaration of disability**

Sommers argues that the ALJ should have addressed and considered the Postal Service's declaration of disability. Sommers took her disability retirement from the Postal Service in August 2008, but claims a July 2010 disability onset date in these proceedings. She offers no explanation why the Postal Service's declaration is only probative for a period beginning 23 months after the fact.

In any event, while the ALJ did observe at Step 4 that Sommers could not perform her past relevant work, the Postal Service's determination of disability is not relevant here. The Social Security Administration is not bound by other agencies' disability determinations. *See* 20 C.F.R. 404.1504 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled . . . is based on its rules and is not our decision about

14

whether you are disabled.").

Further, Sommers' disability retirement from the Postal Service was governed by different, looser standards than those applicable here. Under the Federal Employees Retirement System Act of 1986 (FERS), Sommers was required to show that she could not perform the duties of her past job as a Distribution Clerk at the Postal Service, *not* that she was unable to perform *any* substantial gainful activity as required to establish disability under the Social Security Act. *Compare* 5 U.S.C. § 8451(a)(1)(A)-(B) (standard for disability retirement under FERS) *with* 42 U.S.C. § 423(d) (defining "disability" under the Social Security Act). Thus, her disability retirement from her Postal Service job cannot demonstrate she was entitled to disability benefits under the Social Security Act. *See Trevan v. Office of Pers. Mgmt.*, 69 F.3d 520, 524-25 (Fed. Cir. 1995) (noting that a person who is occupationally disabled and entitled to disability benefits under FERS is not necessarily totally disabled for purposes of the Social Security Act).

## III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: September 17, 2014  
Jefferson City, Missouri